**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED KING FILM DISTRIBUTION LTD, D.B.S. SATELLITE SERVICES (1998) LTD, HOT COMMUNICATION SYSTEMS LTD, CHARLTON LTD, RESHET MEDIA LTD, AND KESHET BROADCASTING LTD,<br><br>*Plaintiffs,*<br><br>v.<br><br>DOES 1-10, d/b/a Israel.tv,<br><br>*Defendants.* | Civil Action No. 21-cv-11024 KPF-RWL |

**AMICUS CURIAE BRIEF OF THE ELECTRONIC FRONTIER FOUNDATION AND THE COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION IN SUPPORT OF NON-PARTY CLOUDFLARE INC. AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT**

Susan V. Metcalfe
(NY Bar No. 5093455)
POTOMAC LAW GROUP, PLLC
1300 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
Telephone: (717) 951-5653
Facsimile: (202) 318-7707
Email: smetcalfe@potomaclaw.com

*Counsel for Computer & Communications Industry Association*

Mitchell Stoltz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993
Email: mitch@eff.org

*Counsel for Electronic Frontier Foundation*

Dated: June 16, 2022

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ..................................................... 1

ARGUMENT ..................................................... 1

I. Rule 65 Does Not Allow Injunctions Against Non-Party Service Providers Absent a Robust Showing Of Active Concert or Participation. ..................................... 2

II. The Digital Millennium Copyright Act Limits Injunctions Against Many Service Providers, Including Cloudflare. ..................................... 5

III. Plaintiffs' Interpretation of the Injunction to Require Active Detection Of Unspecified Infringing Websites Risks Widespread Blocking of Lawful Websites and Speech. ..................................... 7

CONCLUSION ..................................................... 8

# TABLE OF AUTHORITIES

## Cases

*Alemite Mfg. Corp. v. Staff*,
42 F.2d 832 (2d Cir. 1930) ........ 2

*Chase Nat'l Bank v. City of Norwalk*,
291 U.S. 431 (1934) ........ 3

*Little v. Associated Tech. Training Services, Inc.*,
12 F.3d 205 (4th Cir. 1993) ........ 3

*Microsystems Software, Inc. v. Scandinavia Online AB*,
226 F.3d 35 (1st Cir. 2000) ........ 3

*New York v. Operation Rescue Nat'l*,
80 F.3d 64 (2d Cir. 1996) ........ 2

*Next Invs., LLC v. Bank of China*,
12 F.4th 119 (2d Cir. 2021) ........ 3, 4

*Nike, Inc. v. Wu*,
No. 13-cv-8012 (CM), 2020 WL 257475 (S.D.N.Y. Jan. 17, 2020) ........ 3

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ........ 5

*Regal Knitwear Co. v. NLRB*,
324 U.S. 9 (1945) ........ 3

*Spin Master Ltd. v. 158*,
463 F. Supp. 3d 348 (S.D.N.Y. 2020) ........ 4

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978) ........ 2

*United States v. Regan*,
858 F.2d 115 (2d Cir. 1988) ........ 2

*Viacom Int'l, Inc. v. YouTube, Inc.*,
676 F.3d 19 (2d Cir. 2012) ........ 5

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
395 U.S. 100 (1969) ........ 3

## Statutes

17 U.S.C. § 512 ........ 5, 6, 7

Digital Millennium Copyright Act, Public Law 105-394 (1998) ........ 2, 5

## Rules

Fed. R. Civ. P. 65 ........ 2, 3

## Legislative materials

S. Rep. No. 105-190 (1998) ........ 5, 6

**Other Authorities**

Trevor Timm, *After Historic Protest, Members of Congress Abandon PIPA and SOPA in Droves*, EFF Deeplinks Blog (Jan. 19, 2012) ....................4

## INTEREST OF AMICI CURIAE

EFF is a member-supported, non-profit civil liberties organization that works to ensure that technology supports freedom, justice, and innovation for all. Founded in 1990, EFF has over 30,000 contributing members. EFF, its members, and their communities have an interest in a copyright system that fulfills its promise of promoting progress, while preserving free expression and access to knowledge. EFF regularly offers its expertise as *amicus curiae* in cases where a copyright holder's attempts at enforcement of their copyrights threatens to cause collateral harms to these values.[1]

CCIA is an international, not-for-profit membership association representing a broad cross-section of companies in the computer, Internet, information technology, and telecommunications industries. For fifty years, CCIA has promoted open markets, open systems, and open networks. CCIA and its members recognize the importance of combating copyright infringement online, and work closely with copyright owners against rogue sites that distribute infringing material. At the same time, however, CCIA has a compelling interest in ensuring that enforcement efforts are appropriately tailored to avoid unintentional, collateral injury to unrelated non-parties. A list of CCIA members is available at https://www.ccianet.org/members.[2]

## ARGUMENT

Pursuant to a default judgment, Plaintiffs in this case requested a sweeping injunction that purports to bind hundreds, perhaps thousands, of non-party businesses that enable people to

---

[1] *Amicus* EFF previously represented Cloudflare as counsel in two cases, *Arista Records v. Vita Tkach*, No. 1:15-cv-03701-AJN (S.D.N.Y.) and *In re Nat'l Sec. Letter*, 33 F.4th 1058 (9th Cir. 2022). EFF does not currently represent Cloudflare as counsel.

[2] Non-party Cloudflare, Inc. is a member of *amicus* CCIA, as are other entities identified in ECF 49. Cloudflare took no part in the preparation of this brief, nor has it provided or promised any financial support for this brief.

communicate via the Internet, including Internet service providers, domain name registrars, web designers, shippers, advertising networks, payment processors, and content delivery network (CDN) services like non-party Cloudflare. Plaintiffs have moved for a finding of contempt against Cloudflare, and, on information and belief, have served or attempted to serve other service providers with the injunction.

The injunction is impermissibly broad. It is contrary to both Federal Rule of Civil Procedure 65 and the Digital Millennium Copyright Act. It will cause collateral harm to numerous Internet services and their users by imposing unnecessary costs and compliance burdens. Plaintiffs' motion for contempt against Cloudflare is likewise improper. It illustrates the harm that Plaintiffs can cause, and appear ready to cause, through the injunction.

*Amici* are two nonprofit organizations that represent the interests of Internet services and users, respectively. We write to inform the Court about the broader problems presented by the injunction, and why they should lead the Court to deny Plaintiffs' motion for contempt. Plaintiffs do not need, and should not be allowed, to "[c]ut a great road through the law to get after the Devil[.]" *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 195 (1978) (quoting Robert Bolt, *A Man For All Seasons*).

## I. Rule 65 Does Not Allow Injunctions Against Non-Party Service Providers Absent a Robust Showing Of Active Concert or Participation.

Rule 65 of the Federal Rules of Civil Procedure codifies the "well-established principle that, in exercising its equitable powers, a court 'cannot lawfully enjoin the world at large.'" *New York v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996) (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930)); *see also*, *e.g.*, *United States v. Regan*, 858 F.2d 115, 120 (2d Cir. 1988) ("a court generally may not issue an order against a nonparty"). The Rule mandates that an injunction can bind only a limited universe of people: (1) the parties; (2) their "officers, agents,

servants, employees, and attorneys"; or (3) those in "active concert or participation" with them. Fed. R. Civ. P. 65(d)(2); *see Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 112 (1969) ("a nonparty with notice cannot be held in contempt until shown to be in concert or participation"); *see also Little v. Associated Tech. Training Services, Inc.,* 12 F.3d 205 (4th Cir. 1993) ("[A] court must legally identify the participant with the named party before enjoining both persons.").

The "active concert or participation" standard is deliberately narrow. Its purpose is simply to ensure that "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945). The relationship between the party and the nonparty must be "that of associate or confederate." *Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 436-37 (1934); *see also Microsystems Software, Inc. v. Scandinavia Online AB*, 226 F.3d 35, 43 (1st Cir. 2000) ("active concert" requires a "close alliance with the enjoined defendant"). That ensures that "[a] nonparty who has acted independently of the enjoined defendant will not be bound by the injunction." *Microsystems Software*, 226 F.3d at 43. The routine provision of services to a defendant in the absence of such a close relationship is not active concert. *Nike, Inc. v. Wu*, No. 13-cv-8012 (CM), 2020 WL 257475, at *19 (S.D.N.Y. Jan. 17, 2020) (collecting cases).

Plaintiffs must meet a high bar to invoke the court's power over a nonparty. For an injunction to bind a nonparty on an active concert theory requires "clear and convincing proof" that "an enjoined party is substantially intertwined with a non-party." *Next Invs., LLC v. Bank of China*, 12 F.4th 119, 134 (2d Cir. 2021).

The injunction in this case purports to bind all "third parties providing services used in connection with Defendants' operations" without regard to whether they are in active concert or

participation with the Defendants. This is improper. Plaintiffs have provided no "clear and convincing proof" that any non-party service provider, including Cloudflare, is "substantially intertwined" with the Defendants and actively working with them to bypass the injunction. *Next Invs.*, 12 F.4th at 134.

A business that provides services to an enjoined defendant, including services that facilitate online transactions, is not deemed to be in "active concert" based only on the type of service that it provides. *Spin Master Ltd. v. 158*, 463 F. Supp. 3d 348, 381 (S.D.N.Y. 2020). An injunction cannot be a "blank check to fill in" with any business that touches a defendant's infringing materials. *Id.* at 380. Just as Cloudflare does not, as described in its memorandum, control the content of its customers' websites, and cannot block infringing content, many of the other types of intermediary listed in the injunction have no ability to stop infringement by their customers. Many, including the Internet Service Providers (ISPs) listed in the injunction, are likely not providing services to the Defendants at all—they simply transmit data requested by their own customers, which may include data from the Defendants' website.

Moreover, many of these are also small and mid-sized businesses for whom complying with injunctions of this sort would impose a significant burden. Many small online service providers do not have full-time staff who can ensure compliance with website-blocking injunctions. And because U.S. law has no established mechanism for website-blocking,[3] many of these businesses do not have technical and administrative systems in place to comply with such injunctions. Thus, for smaller providers, compliance is much more expensive on a per-user basis

---

[3] In fact, Congress has considered and rejected the creation of a formal legal mechanism for website-blocking. *See* Trevor Timm, *After Historic Protest, Members of Congress Abandon PIPA and SOPA in Droves*, EFF Deeplinks Blog (Jan. 19, 2012), https://www.eff.org/deeplinks/2012/01/after-historic-protest-members-congress-abandon-pipa-and-sopa-droves.

than it is for larger businesses who may already receive such orders from other countries. What's more, once small businesses are effectively required to build administrative systems for website-blocking, they face increased danger of being compelled or coerced into using those systems to block other communications, including constitutionally protected speech. The requirement to establish active concert through clear and convincing proof protects the due process rights of these businesses and their innocent users and customers.

## II. The Digital Millennium Copyright Act Limits Injunctions Against Many Service Providers, Including Cloudflare.

In copyright cases, Congress has limited the type and scope of injunctions that can be imposed on online service providers in response to infringement by their users. The Digital Millennium Copyright Act (DMCA) was enacted in part to "clarify the liability faced by service providers who transmit potentially infringing material over their networks.'" *Viacom Int'l, Inc. v. YouTube, Inc*., 676 F.3d 19, 27 (2d Cir. 2012) (quoting S. Rep. No. 105-190, at 2 (1998)). Congress recognized that "in the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability." S. Rep. No. 105-190, at 8.

To that end, Congress created a series of "safe harbors for certain common activities of service providers." *Id*. at 19. The DMCA safe harbors offer far-reaching protection: "A service provider that qualifies for such protection is not liable for monetary relief and may be subject only to the narrow injunctive relief set forth in section 512(j)." *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1158 (9th Cir. 2007).

The DMCA provides that a "court may grant injunctive relief with respect to a service provider only in one or more" of the forms set out in the statute. 17 U.S.C. § 512(j)(1). That ensures that any injunction issued against a service provider covered by the Section 512(b), (c), or (d) safe

harbors focuses narrowly on "material or activity residing at a particular online site" (§512(j)(1)(A)(i)), and is the "least burdensome to the service provider among the forms of relief comparably effective for that purpose" (§ 512(j)(1)(A)(iii)). For providers covered by Section 512(a), which include those like Cloudflare who transmit data or provide connections to websites, Congress imposed even more stringent limits. § 512(j)(1)(B). Any order directed at such providers in a case involving a foreign website must specify "reasonable steps" for the provider to take to block access "to a specific, identified, online location outside the United States." § 512(j)(1)(B)(ii).

In addition, Section 512(j)(2) "identifies factors a court must consider in deciding whether to grant injunctive relief and in determining the appropriate scope of injunctive relief." S. Rep. No. 105-190, at 53. Those include "whether such an injunction, either alone or in combination with other such injunctions issued against the same service provider under this subsection, would significantly burden either the provider or the operation of the provider's system or network," (§ 512(j)(2)(A)); and "whether other less burdensome and comparably effective means of preventing or restraining access to the infringing material are available" (§ 512(j)(2)(D)).

Beyond all that, subsection (j) includes a vital procedural protection: "injunctive relief under this subsection shall be available only after notice to the service provider and an opportunity for the service provider to appear are provided." § 512(j)(3). This provision "prohibits most forms of ex parte injunctive relief (including temporary and preliminary relief) against a service provider qualifying for a liability limitation under section 512." S. Rep. No. 105-190, at 53.

All of these limitations apply to any injunction targeting providers that perform functions covered by Section 512, including Cloudflare and many of the types of entities listed in the injunction in this case.

Accordingly, if Cloudflare and the other non-party service providers had been named as

defendants— and had been found liable for copyright infringement for linking to, hosting, or transmitting infringing material from Defendants' website—any injunction issued against those service providers would be subject to the requirements of 17 U.S.C. § 512(j). But Plaintiffs here have not named any service provider as a defendant. They have come forward with no allegations or evidence suggesting that any service provider is secondarily liable for any copyright infringements occurring on the Defendants' websites.

Nevertheless, Plaintiffs now purport to bind "any" service provider as a non-party upon after-the-fact notice of the injunction. That is not permissible: under the DMCA, any such injunction would need to have been shown to be the least burdensome relief available, and could only be issued following proper consideration of the factors set out in the bullets above. Plaintiffs' contempt motion ignores these requirements, leading to the potentially absurd result of copyright plaintiffs enforcing an injunction against an online service provider as a nonparty that would have been barred by the DMCA against that same service provider had it been adjudicated as a culpable defendant. Endorsing that result would do unacceptable violence to the balanced statutory scheme set out by Congress in the DMCA.

## III. Plaintiffs' Interpretation of the Injunction to Require Active Detection Of Unspecified Infringing Websites Risks Widespread Blocking of Lawful Websites and Speech.

Plaintiffs' motion attempts to hold Cloudflare in contempt for, in part, failing to block five websites that were not named in the injunction. Memorandum in Support of Motion for Contempt against Cloudflare, Inc. (ECF No. 64), at 6. In effect, Plaintiffs are asserting that the injunction requires Cloudflare and other service providers to determine whether *any* of their current or future users are "associated with the infringing Website." *Id.*

Requiring service providers to actively detect and block websites that are not explicitly named in an order, on pain of contempt sanctions, would create a strong incentive for those service

providers to preemptively block sites that show any appearance of being affiliated with an enjoined defendant, but in fact are not. For example, the five additional websites referenced in Plaintiffs' motion have domain names that contain the generic phrase "Israel TV" but otherwise have no clear connection to the Defendants. If Cloudflare is effectively compelled to block all domains containing that phrase, or variants, to avoid contempt, it will likely block innocent websites, containing lawful and Constitutionally protected speech. Extending this duty of active detection and blocking to all of the types of service providers referenced in the injunction would make the blocking of lawful websites, and protected speech, a near-certainty. That's why, even if nonparties like Cloudflare could be bound by the injunction, Plaintiffs' interpretation of what the injunction requires risks significant First Amendment and due process harms to innocent service providers and users.

## CONCLUSION

Service providers who help Internet users transmit information and communicate with one another depend on the due process protections provided by the Federal Rules of Civil Procedure and substantive law, particularly where copyright is at issue. A rightsholder bearing an injunction cannot conscript every Internet intermediary to help cut every Internet user off from accessing an infringing website. Moreover, the rightsholder cannot conscript even one intermediary to that end without fulfilling the law's requirements: a clear showing of active concert, and an injunction that meets the procedural and substantive limitations imposed by the DMCA. This Court should deny the motion for contempt against Cloudflare. Further, it should treat with skepticism any future attempts to enforce the injunction in this case against nonparty service providers.

San Francisco, California
Dated: June 16, 2022

Respectfully submitted,

*/s/ Mitchell Stoltz*

Mitchell Stoltz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: 415-436-9333
Facsimile: 415-436-9993
Email: mitch@eff.org

*Counsel for Electronic Frontier Foundation*

Susan V. Metcalfe
(NY Bar No. 5093455)
POTOMAC LAW GROUP, PLLC
1300 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (717) 951-5653
Facsimile: (202) 318-7707
Email: smetcalfe@potomaclaw.com

*Counsel for Computer & Communications Industry Association*